Filed 7/26/24  St. Francis Electric v. Dept. of Transportation CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ST. FRANCIS ELECTRIC, LLC, | C098129 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2022-80003922-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF TRANSPORTATION, | |
| Defendant and Respondent; | |
| ALFARO COMMUNICATION CONSTRUCTION, INC., | |
| Real Party in Interest and Respondent. | |

California law requires public agencies to conduct a competitive bidding process before awarding contracts on certain projects.  This process involves an agency publicly advertising that it seeks bids for a project, publicly opening any submitted bids at an assigned time, and, in general, awarding the project contract to the lowest responsible bidder.  Typically, bidders participating in this process cannot withdraw their bids after submitting them.  But in some cases, a bidder may seek to withdraw its bid based on a mistake.  In that event, however, under Public Contract Code section 5105 (section 5105), the bidder is "prohibited from participating in further bidding on the project on

1

which the mistake was claimed . . . ." This restriction serves to disqualify those who seek to withdraw their bids from rebidding the same project.

In this case, the Department of Transportation (Caltrans) concluded that a company that withdrew its bid on a project due to a mistake could participate in further bidding after Caltrans rejected all bids on the project, modified the project in some respects, and again advertised for bids. Caltrans reasoned that the changes it made to the project rendered section 5105's prohibition on further bidding inapplicable. Another bidder on the project, St. Francis Electric, LLC (St. Francis), objected to Caltrans's decision and asked the trial court to find the decision unlawful. It argued that the initial project and the revised project, although different in minor respects, remained the same for purposes of section 5105 and so the statute's prohibition on further bidding applied. The trial court, however, disagreed and ruled in Caltrans's favor. Applying a deferential standard of review, we affirm.

BACKGROUND

In September 2021, Caltrans advertised a project for the installation of fiber optic cable systems and other improvements on State Routes 51 and 99. Caltrans described the project as follows in the notice to bidders:

> "For Construction on State Highway in Sacramento County in and near Elk Grove and Sacramento on Route 99 from Grant Line Road to Route 50 and on Route 51 from Route 50 to 0.1 mile south of the Fort Sutter Viaduct.
>
> "[¶] . . . [¶]
>
> "Contract No. 03-0H6704
>
> "03-Sac-51, 99-0.0/0.1, 10.0/R24.3
>
> "Project ID 0316000005
>
> "Federal-Aid Project
>
> "ACNH-X067(084)E"
>
> (Some capitalization omitted.)

2

The bid package included, among other things, nearly 400 pages consisting of a notice to bidders, special provisions, and standard specifications.

Alfaro Communications Construction, Inc. (Alfaro) submitted the lowest bid on the project. But a couple of days after Caltrans reviewed the submitted bids, Alfaro asked to withdraw its bid, citing a mathematical error in its listed labor costs. Caltrans agreed to allow Alfaro to withdraw. It afterward rejected all bids and informed the bidders, including St. Francis, that the scope of the work and funding for the project would be reevaluated and the project readvertised.

In February 2022, following some modifications to the project requirements and specifications, Caltrans again advertised the project for bids. The general project description and contract number remained the same:

"For Construction on State Highway in Sacramento County in and near Elk Grove and Sacramento on Route 99 from Grant Line Road to Route 50 and on Route 51 from Route 50 to 0.1 mile south of the Fort Sutter Viaduct.

"[¶] · · · [¶]

"Contract No. 03-0H6704

"03-Sac-51, 99-0.0/0.1, 10.0/R24.3

"Project ID 0316000005

"Federal-Aid Project

"ACNH-X067(084)E"

(Some capitalization omitted.)

The revised bid package, like the initial bid package, included a notice to bidders, special provisions, and standard specifications. But this time, these materials were 30 pages longer.

Once more, Alfaro submitted the lowest bid on the project. St. Francis, the second lowest bidder, filed a written protest with Caltrans of the award to Alfaro, arguing that because Alfaro had earlier withdrawn its bid on the initial project advertised in 2021, it

3

could not bid on the revised project advertised in 2022. It reasoned this followed from section 5105's prohibition on a bidder that withdraws a bid on a project from participating in further bidding on the same project.

Caltrans rejected St. Francis's protest in a June 2022 letter. It concluded that the initial and revised projects were different, reasoning that "in addition to other changes made to the rebid version of [the project], Caltrans made the following material changes: (1) Providing additional working days; (2) Allowing for possible 55-hour lane closures; (3) Revising the plans to reflect common industry installation process(es); and (4) Increasing the Disadvantaged Business Enterprise (DBE) goal." Elaborating on the first reason, Caltrans noted that the original solicitation allowed between 100 to 140 working days, but the revised solicitation allowed 130 to 180 working days. And elaborating on the third reason, it wrote that the original plan sheets set borehole spacing at 500-foot intervals, but the revised plan sheets set borehole spacing at closer to 300-foot intervals.

St. Francis afterward filed a petition for writ of mandate and complaint with the trial court, seeking, among other things, to have the court set aside Caltrans's decision. The trial court denied its request for relief. While the court acknowledged that many aspects of the original project and the revised project were identical, it concluded that the change in working days, the change in potential borehole spacing, and the increase in the DBE goal were all substantive changes supporting Caltrans's determination that the two projects were different for purposes of section 5105. The court added that Alfaro had described several other differences between the two projects. But it found it unnecessary to consider these additional differences, finding the reasons Caltrans identified sufficient to rule in its favor. St. Francis timely appealed.

4

I

*Mootness*

We start with Caltrans's claim that this matter is moot. A few days before oral argument, Caltrans moved to dismiss this appeal on the ground of mootness. It stated that it formally accepted Alfaro's completed work for the project over two months before, and it provided a declaration from its manager for this project confirming the same. It then argued that this appeal is therefore moot, for the only relief St. Francis seeks on appeal is to invalidate the award of the project to Alfaro and to have the project awarded to itself.

We reject Caltrans's argument and deny its motion to dismiss. St. Francis, it is true, sought in its petition and complaint to invalidate the award of the project to Alfaro. But it also sought a declaration of the parties' rights, attorney fees under Code of Civil Procedure section 1021.5, and "[s]uch other relief as the Court deems just and proper"— which it later argued included bid preparation costs and bid protest costs. At the trial level, moreover, Caltrans agreed that should St. Francis succeed on its petition, "it may seek costs of bid preparation." Alfaro said the same. Considering these remedies, and particularly the potential for bid preparation costs, we decline to find this appeal moot. (See *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 308 [bidder that was wrongfully denied a public contract could recover bid preparation costs]; *In re D.P.* (2023) 14 Cal.5th 266, 276 ["A case becomes moot when events ' "render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief" ' "].)

Resisting this conclusion, Caltrans tries to discount these additional remedies. It argues that St. Francis failed to pray for bid preparation costs in its petition and complaint and so forfeited its rights to seek these costs. And it asserts that St. Francis also forfeited its rights to declaratory relief and attorney fees because it never specifically mentioned

5

them in its opening brief.  Neither of these arguments are persuasive.  To Caltrans's argument on forfeiture, St. Francis clearly seeks in this appeal a reversal of the trial court's decision.  And while it did not spell out all that would come with this reversal, we do not find it forfeited its potential remedies as a result.  To Caltrans's claim that St. Francis never prayed for bid preparation costs, we agree St. Francis did not specifically pray for this remedy.  But courts have explained that "[t]he prayer is not essential in a contested case[;] it may be corrected or supplied by amendment, and recovery may be allowed even in the absence of a prayer." (*Estate of Kalal* (1981) 121 Cal.App.3d 841, 845, fn. 3; see 4 Witkin, Cal. Proc. (6th ed. 2024) § 507 ["under the authorities, [the prayer] is not even essential in a contested case"].)  Considering this principle, together with Caltrans's concession at the trial court level that St. Francis could seek these costs if it prevailed on its claims, we reject Caltrans's current stance that St. Francis actually cannot seek these costs.  (See Code Civ. Proc., § 475 ["The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties"].)[1]

II

*Standard of Review*

Under Code of Civil Procedure section 1085, a public agency's decision must be upheld unless it is shown to be "arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair.' " (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 460 (*American Coatings*).)  Courts performing this review employ varying degrees of judicial scrutiny depending on the type

---

[1] Caltrans further argues that St. Francis's claim for declaratory relief, even if not forfeited, cannot itself serve to overcome mootness.  But because we decline to find mootness based on the potential for bid preparation costs, we need not address this argument.

of action under review. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576.) As our Supreme Court has explained, " '[t]he appropriate degree of judicial scrutiny in any particular case . . . lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' " (*Id.* at pp. 575-576.) "Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum." (*Id.* at p. 576.) For all these actions, however, courts will exercise independent judgment when reviewing questions of law, including issues of statutory construction. (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415.)

Under long-standing precedent, this case involves a quasi-legislative decision. Long ago our Supreme Court held that a city's acts of issuing an order for the improvement of a street, inviting proposals for the work, and awarding a contract for the work "are all legislative in character." (*Quinchard v. Board of Trustees* (1896) 113 Cal. 664, 671.) Courts since then have repeatedly said that " ' "[a] public entity's 'award of a contract, and all of the acts leading up to the award, are legislative in character.' " ' " (*San Diegans for Open Government v. City of San Diego* (2018) 31 Cal.App.5th 349, 363; see also *Bull Field, LLC v. Merced Irrigation Dist.* (2022) 85 Cal.App.5th 442, 458 ["numerous courts have recognized that a public agency's decision concerning the award of a contract is a legislative or quasi-legislative act"].) That includes a public entity's decision to reject a bid protest before awarding a contract. (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 ["both the award of the contracts and the decision to reject the protest should be considered legislative actions"].) Consistent with this precedent, we will treat Caltrans's award of the contract here as a quasi-legislative decision subject to a lesser degree of judicial scrutiny.

Although the parties urge us to employ different standards of review, either more liberal or more strict, we conclude we must consider whether Caltrans's determination

was arbitrary, capricious, or entirely lacking in evidentiary support. To quote our Supreme Court, under Code of Civil Procedure section 1085, a public agency's quasi-legislative decision must be upheld unless it is shown to be " 'arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair.' " (*American Coatings, supra*, 54 Cal.4th at p. 460.) And as the court has explained, " 'whether agency action is "entirely lacking in evidentiary support" is not the same as a substantial evidence test.' " (*Id.* at p. 461.) The substantial evidence test "is generally used in reviewing administrative adjudications under Code of Civil Procedure section 1094.5." (*Ibid.*) That is a deferential standard. But the different standard of review "employed under Code of Civil Procedure section 1085 is more deferential to agency decisionmaking than the substantial evidence standard." (*Ibid.*) "Although both standards ' "require a *reasonable basis* for the decision" ' [citation], they should not be conflated." (*Ibid.*)[2]

III

*Section 5105*

With this deferential standard of review in mind, we consider St. Francis's argument that Caltrans improperly allowed Alfaro to participate in the bidding on the

---

[2] Some Courts of Appeal have applied the substantial evidence test when reviewing quasi-legislative decisions under Code of Civil Procedure section 1085; others have instead considered, as we do here, whether these decisions are arbitrary, capricious, or entirely lacking in evidentiary support. (Compare *Golden Drugs Co., Inc. v Maxwell-Jolly* (2009) 179 Cal.App.4th 1455, 1466 [saying the relevant standard is the "entirely lacking in evidentiary support" test, not the substantial evidence test], with *Mike Moore's 24-Hour Towing v. City of San Diego, supra*, 45 Cal.App.4th at pp. 1302, 1306 [indicating that under Code Civ. Proc., § 1085, courts consider whether factual determinations are "entirely lacking in evidentiary support," but then saying, "[i]n essence, the question is whether substantial evidence supports the agency's decision"].) Considering this topic, one secondary source has said "the courts have not been entirely consistent in stating the standard of judicial review." (Cal. Civil Writ Practice (Cont.Ed.Bar 4th ed. 2023) § 2.38C.)

revised project. We cover first the law relevant to St. Francis's argument before turning to its application to this case.

A.    *Relevant Law*

All parties agree that two legal authorities guide our analysis here: section 5105 and *Colombo Construction Co. v. Panama Union School Dist.* (1982) 136 Cal.App.3d 868 (*Colombo*).

Section 5105 states: "A bidder who claims a mistake or who forfeits his or her bid security shall be prohibited from participating in further bidding on the project on which the mistake was claimed or security forfeited." *Colombo*, in turn, considered the application of this language (then codified in former Government Code section 4205) when a bidder on a project withdrew its bid based on a mistake and the public entity then rebid the project. (*Colombo, supra*, 136 Cal.App.3d at p. 876.) The public entity there concluded that the bidder could not participate in the rebid. (*Id.* at p. 874.) The trial court agreed. (*Id.* at pp. 874-875.) In affirming, the Court of Appeal found that the bidder's ability to participate in the rebid under the statute depended on "the identity of the project," with the bidder able to participate if the project's identity changed but not if it remained the same. (*Id.* at pp. 875-876.) The court then held in the public entity's favor, reasoning that "the project remained virtually the same" from the first bid to the second bid and that substantial evidence thus supported the trial court's conclusion that the project remained the same. (*Id.* at p. 877.)

While all parties agree these legal authorities provide the governing framework here, they each describe this framework differently. St. Francis believes section 5105 bars a bidder that withdraws its bid for a project from rebidding the same project. It adds that this statutory bar on further bidding applies when the identity of the project remains the same and, quoting *Colombo*, asserts that " 'not every change will destroy the identity of the project.' " (*Colombo, supra*, 136 Cal.App.3d at p. 876.) Caltrans, in contrast, objects to a standard focusing on the identity of the project, asserting that *Colombo* used

9

this language only in dicta in its case-specific factual analysis and not as a legal test. In its view, the relevant test is whether the initial and revised projects were the same, with section 5105's bar applying only in that case. Alfaro, in turn, takes an altogether different approach. While it says it agrees that the governing legal framework derives from section 5105 and *Colombo*, it ultimately rejects *Colombo*'s core holding that section 5105 applies when a public agency rejects all bids and rebids a project. It reasons that section 5105 only applies when a bidder withdraws its bid based on a mistake and then submits a second bid "on the same, original bid" after seeing the other submitted bids.

Considering the statutory text and its legislative history, we generally agree with St. Francis's reading of section 5105. In particular, we agree it bars a bidder that withdraws its bid for a project based on a mistake from rebidding the same project. That follows from the statute's plain text. A bidder, after all, that submits a bid on a project, withdraws it based on a mistake, and submits another bid when the same project is rebid, has "further bid[] on the project." (§ 5105.) Section 5105 explicitly bars this type of conduct. The legislative history for the bill initially enacting section 5105's language confirms this reading. An enrolled bill report from the Department of Public Works for the former Government Code section 4205, for instance, states the bill "provides that a contractor who is relieved of his bid or forfeits his bid security may not rebid the project. This would not substantially reduce competition and could prevent a scheme to rebid after seeing all other bids at a prior bidding." (Dept. of Pub. Works, Enrolled Bill Rep. on Sen. Bill No. 1170 (1971 Reg. Sess.) Nov. 15, 1971, p. 1.) The enrolled bill memorandum to the Governor is similar, stating that "the bill will disqualify contractors who claim such relief from rebidding the same contract." (Enrolled Bill mem. to Governor, Sen. Bill. No. 1170 (1971 Reg. Sess.) Nov. 22, 1971.)

We also generally agree with St. Francis's reading of *Colombo*. St. Francis, again, contends *Colombo* focused on the "identity of the project" when applying section 5105's predecessor. We read *Colombo* the same. That court concluded that the applicability of

10

the statute turned on a factual question, namely, "the identity of the project." (*Colombo, supra*, 136 Cal.App.3d at p. 876.) It then explained that if the identity changed, then the statutory bar on further bidding was inapplicable; but if the identity remained the same, then it applied. (*Ibid.*) That was the court's understanding of section 5105's predecessor and not, as Caltrans argues, simply dicta appearing in the court's case-specific factual analysis. We reject, however, St. Francis's apparent belief that the *Colombo* court said a project's identity would remain the same unless the nature and scope of the project changed. Although the court indicated that the "nature of the change" to a project mattered—adding, on that topic, that limited changes serving only to defer certain work were not enough to escape the bar on further bidding—it never said the nature and scope of the project itself needed to change. (*Colombo*, at p. 877.)

Still, while we reject in part St. Francis's and Caltrans's dueling readings of *Colombo*, we see little daylight between their interpretations of section 5105. Both, in the end, endorse the same general reading: Section 5105 bars a bidder that has withdrawn its bid on a project from participating in any rebid for the same project. Both also accept that some project changes may render section 5105 inapplicable on a rebid, but not every project change will be sufficient. We agree with that understanding. (See *Colombo, supra*, 136 Cal.App.3d at p. 876 ["it is obvious that not every change will destroy the identity of the project"].) And while Caltrans objects to a standard focused on the identity of the project, whether a project remains the same and whether a project's identity remains the same are not, in our view, different standards. Even *Colombo* appeared to use the two interchangeably, saying, at the start, that the applicability of section 5105's predecessor turned on the "identity of the project" (*Colombo*, at p. 876)

11

and concluding, in the end, that substantial evidence supported a finding that the statute was inapplicable because "the second bid was in fact on the same project" (*id.* at p. 877).[3]

B.      *Application of Section 5105*

Having established the relevant legal framework, we turn to St. Francis's argument.  Citing section 5105 and *Colombo*, it contends Alfaro could not participate in the bidding on the revised project, because it earlier withdrew its initial bid on this same project.  We reject its argument, concluding that St. Francis has not met its burden to show that Caltrans's decision that the projects identified in the first and second bid invitations were sufficiently different was arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair.

In concluding that the two projects were different for purposes of section 5105, Caltrans wrote:  "Here, in addition to other changes made to the rebid version of [the project], Caltrans made the following material changes:  (1) Providing additional working days; (2) Allowing for possible 55-hour lane closures; (3) Revising the plans to reflect common industry installation process(es) [namely, revising the requirements for borehole

---

[3]  Caltrans and St. Francis also agree that section 5105 is inapplicable when a project is " 'so sufficiently and substantially changed that it is no longer the same project within the meaning of [section 5105].' "  The parties derive this quoted language from *Colombo*, which said:   "We can agree in theory with appellant's contention a project may, on rebid, be so sufficiently and substantially changed that it is no longer the same project within the meaning of [section 5105's predecessor]."  (*Colombo, supra*, 136 Cal.App.3d at p. 876.)  In our view, however, this quoted language is not particularly helpful.  First, it is dicta.  Second, it is largely meaningless, other than to say that the test is whether the project is no longer the same within the meaning of section 5105.  If any change is enough to make a project no longer the same within the meaning of this statute, then any change is enough to say the project has been "so sufficiently and substantially changed that it is no longer the same project within the meaning of [section 5105]."  On the other hand, if only a complete revision is enough to make a project no longer the same within the meaning of this statute, then only a complete revision is enough to say the project has been "so sufficiently and substantially changed that it is no longer the same project within the meaning of [section 5105]."  (*Colombo,* at p. 876.)

12

spacing]; and (4) Increasing the Disadvantaged Business Enterprise (DBE) goal." Caltrans also noted that it considered Alfaro's written responses to St. Francis's protest. These responses described several additional project changes, including that Caltrans obtained new engineer approvals for the revised project, increased its cost estimate and cost per day, added 30 additional pages of specifications, and changed the quantities for 11 of the 39 items (almost 30 percent) on the bid item list, including the quantities for aggregate asphalt (550 cubic yards to 670 cubic yards), tack coat (1.5 tons to 2.2 tons), and compost (220 cubic yards to 530 cubic yards).

Focusing on the four reasons Caltrans highlighted, St. Francis argues that none has evidentiary support. First, it challenges Caltrans's reliance on the additional working days for the project. While the initial bid advertisement described a project timeline of 100 to 140 days, the revised bid advertisement gave a timeline of 130 to 180 days. In its June 2022 letter rejecting St. Francis's protest, Caltrans explained that this change followed from its "consideration that the COVID pandemic created supply chain backlogs in various industry sectors, including construction." It added that "[a]n increase in working days could potentially alleviate market pressure from supply and logistical issues." Considering Caltrans's reasoning, St. Francis argues this change was meaningless because it had "nothing to do with the scope or 'identity' of the Project"; it was simply a consequence of the pandemic.

But considering the record here, we are satisfied that the change in the project's timeline was relevant and material. At the start, we agree with St. Francis that the increase in working days did not evidence any change in the project plans or specifications; it evidenced instead only the logistical issues resulting from the COVID-19 pandemic. We agree too that this consideration limits the significance of this change. Still, the record supports a finding that the substantial increase in the project timeline was a meaningful change. As the record establishes, the COVID-19 pandemic could make two projects that were identical in terms of plans and specifications very different in

13

terms of costs and timelines. At some point, these types of differences can become so dramatic that the projects cannot be said to be the same from the perspectives of the project developer and the bidding contractors. So it was here, at least to a degree. According to Alfaro's CEO, the increase in working days required it to bid the project differently, with increased overhead required for the project, extended equipment rentals necessary to cover the extended working period, and additional labor and traffic control required to cover the additional working days. Those were real consequences that made the revised project different from the bidders' perspective. And while these changes did not change the thing to be built—the intuitive focus of our analysis—we decline to limit our review to this single metric. We instead find other considerations can matter too, including how the work is performed, when it is performed, where it is performed, and who is to perform the work.

Second, St. Francis challenges Caltrans's reliance on the purported change "[a]llowing for possible 55-hour lane closures." As far as we can tell, and as St. Francis argues, none of the project plans or specifications discuss the possibility of a 55-hour lane closure. The trial court, for this reason, called this rationale unsupported by the evidence. Caltrans does not claim otherwise on appeal, declining to offer any comment on this topic. Although we would have appreciated Caltrans being forthright on this issue, rather than simply ignoring it, we take from its silence its agreement that this rationale lacks evidentiary support.

Third, St. Francis objects to Caltrans's reliance on the revised requirements for borehole spacing. Explaining this change, Caltrans wrote that in the initial bid advertisement borehole spacing was set at 500-foot intervals, but in the second bid advertisement borehole spacing was set closer to 300-foot intervals. As St. Francis notes, Caltrans appears to have calculated these intervals based on the changed number of bore pits listed in the project plan sheets. The initial plan sheets listed 281 bore pits—which, in St. Francis's calculation, would result in borehole spacing of 541 feet under equidistant

14

spacing—but the revised plan sheets listed 422 bore pits—which, in St. Francis's calculation, would result in borehole spacing of 360 feet under equidistant spacing. Objecting to Caltrans's reliance on this change, St. Francis asserts that Caltrans failed to explain its reasons for finding this change material.

We agree Caltrans's reasoning was lacking. Attempting to explain its reasoning in the trial court, Caltrans's manager for the project said in a declaration that this change was "intended to make underground drilling more efficient" and was "a key difference" between the initial and revised projects. But saying a difference is "key" and showing a difference is key are two different things. Caltrans's project manager may be an expert on these types of things, but even so, an expert opinion is worth no more than the reasons and facts on which it is based. (*McAlpine v. Norman* (2020) 51 Cal.App.5th 933, 939.) Because we find nothing in the record evidencing the significance of the changed borehole spacing here, other than the vague comment that it was intended to make underground drilling more efficient, we cannot say that Caltrans had a reasonable basis for crediting this detail. That is problematic, for even with quasi-legislative decisions, an agency still must have a " ' "*reasonable basis*" ' " for its decision. (*American Coatings, supra*, 54 Cal.4th at p. 461; see also *id.* at p. 460 ["When inquiring into whether a regulation is arbitrary, capricious, or lacking in evidentiary support, the ' " ' " 'court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute' " ' " ' "].)

Lastly, in terms of Caltrans's specified reasons, St. Francis objects to Caltrans's reliance on the increase in the DBE goal from 11 to 15 percent. Discussing this change, Caltrans's manager for this project explained in a declaration that this "goal represents the percentage of a contractor's total bid that must be committed to DBE-certified businesses" and that "[i]ncreasing a DBE goal for a project alone can result in significant changes to a project for most bidders of larger public works projects." Objecting to this

conclusion, St. Francis suggests the changed DBE goal here should not be considered relevant for purposes of section 5105, because it was not a discretionary change; it was instead an automatic change triggered by inflation. It reasons that "the new DBE goal was an obligatory and formulaic reflection" of Caltrans's revised cost estimate for the project—which, at $16,500,000, was over $7,000,000 more than the initial cost estimate of $9,200,000—and that this increased cost estimate was merely the product of the COVID-19 pandemic's inflationary market impacts. St. Francis further argues that "Caltrans offered no evidence or argument that the increased DBE goal *in fact* changed *this Project* or that it impacted its overall identity for section 5015 purposes."

We find neither point persuasive. Starting with its claim that Caltrans offered no evidence that the increased DBE goal changed the project, the evidence shows Caltrans increased the DBE goal by over 35 percent (from 11 to 15 percent) for the revised project. It shows too that this change had consequences, including for St. Francis. Had the DBE goal remained at 11 percent, St. Francis could have satisfied this goal using only one DBE-certified business. That is because one DBE-certified business it used was to perform work in the amount of $2,579,072, which was about 13.5 percent of St. Francis's total bid amount of $19,054,000. But because the DBE goal was now 15 percent, that was insufficient. And so to reach this 15 percent goal St. Francis needed to use another DBE-certified business—which it did, increasing its total DBE amount to $3,094,647. That was a material change. And while this did not change the thing to be built, we again find other considerations—including who is to perform the work—can be relevant to our analysis.

Turning to St. Francis's point that the increased DBE goal was an automatic change triggered by inflation and the resulting increased cost estimate, we find its factual premise unsupported for several reasons. First, it says it is "undisputed" that the increased cost estimate reflected the COVID-19 pandemic's inflationary market impacts and not any changes to the scope of work. But while it is perhaps undisputed that

16

inflation resulted in increased project costs, St. Francis has not shown that inflation was responsible for all increases in project costs here. Second, it cites a declaration from its vice president stating that "the adjusted DBE goal simply reflects the modified engineer's estimate in the Project re-bid" and suggesting that the precise DBE goal for a given project is derived from some requirement for federal aid projects. But neither this declaration, nor St. Francis's briefing on appeal, cites or discusses this requirement. For that reason, we will disregard St. Francis's conclusory statement that "the new DBE goal was an obligatory and formulaic reflection" of Caltrans's revised cost estimate. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [courts may " 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt' "].)

In the end, we agree, as St. Francis argues, that the initial and revised projects were identical in many respects. The two projects, for instance, included the same general project description (as described above in the background section, *ante*), the same project contract number (03-0H6704), and the same general work description ("Install fiber optic cable systems & construct MVPs"). But the projects also had several material differences. And for the reasons discussed, St. Francis has not persuasively challenged two of Caltrans's highlighted reasons for finding these projects different for purposes of section 5105—namely, its reliance on the increased working days and the increased DBE goal.

Nor has St. Francis addressed most of the many other changes between these projects. It never addresses the 30 additional pages of specifications for the revised project. It never addresses the changed quantities for nearly 30 percent of the items listed on the bid item list. And it never adequately explains the significant increase in Caltrans's cost estimate for the project (from $9,200,000 to $16,500,000), nor the significant increase in its own bid amount for the project (from $16,797,000 to

17

$19,054,000). Although, again, it attributes the revised cost estimate to inflationary pressures from the COVID-19 pandemic, its cited evidence only shows that the pandemic caused costs to increase, not that it caused all increases here. And both Caltrans and Alfaro submitted evidence showing that costs increased in part because of project changes, including changes in material quantities and changes in the project timeline. We find St. Francis's failure to address these details significant, for again, it carries the burden of showing Caltrans's decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. (*American Coatings, supra*, 54 Cal.4th at p. 460.)

Although St. Francis offers a reason for not addressing changes other than the four Caltrans explicitly referenced in its June 2022 letter, we find its reason unpersuasive. It argues it had no need to address these changes, and that no court may consider these changes, because Caltrans only discussed four "material changes" in its letter and deemed all other changes immaterial. But Caltrans never claimed only four material changes existed between the initial and revised projects. It instead described four "material changes" and said those were "in addition to other changes"—changes it neither characterized as material nor immaterial.

On this record, and mindful that we are reviewing a quasi-legislative decision and not a quasi-judicial decision, we decline to limit our review only to those changes Caltrans specifically highlighted. (Compare *McKinny v. Board of Trustees* (1982) 31 Cal.3d 79, 88 ["an administrative agency exercising a quasi-legislative function is not required to make detailed findings of fact"], with *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 [an agency, in its adjudicative decisions, "must render findings sufficient both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the [agency's] action"].) We find instead that in evaluating whether the initial and revised projects were the same, the appropriate focus is

18

on the record before Caltrans at the time of its decision. (See *American Coatings, supra*, 54 Cal.4th at p. 460 [considering the record before the agency at the time of its decision].) And considering this record—including the 30 additional pages of specifications, the changed quantities for nearly 30 percent of the items listed on the bid item list, the increased DBE goal, the increased working days, and the increased project costs—we conclude that St. Francis has not met its burden to show that Caltrans's determination was entirely lacking in evidentiary support. Nor has it shown that Caltrans's determination was arbitrary, capricious, unlawful, or procedurally unfair.

IV

*St. Francis's Remaining Arguments*

We also reject St. Francis's remaining reasons for seeking reversal.

St. Francis first contends Caltrans's determination that the initial and revised projects were different was an improper "*post facto* 'finding.' " It reasons that section 5105 required Caltrans to determine before receiving bids on the revised project whether the two projects were the same. It also describes how Caltrans could generally fulfill this obligation under section 5105—it could "include an express statement in a Re-bid (or readvertisement) as to whether the announced project is 'new' or 'different' for purposes of section 5105." St. Francis adds that "it is unfair and inconsistent with the statute's meaning and intent to force impacted bidders to enforce section 5105 through a bid protest procedure unintended for that purpose," reasoning, without any citation to authority, that bid protests serve only to allow bidders to challenge the contracting agency's decision as to whether a low bid is responsive.

But even assuming section 5105 required Caltrans to determine whether the initial and revised projects were the same before receiving bids on the revised project, St. Francis has not shown that Caltrans failed to do so. While we can say that Caltrans did not publicly state that the initial and revised projects were different until its letter in June 2022, we find nothing in the record (and St. Francis cites nothing) concerning when

19

Caltrans initially made its decision. To the extent, moreover, that St. Francis believes section 5105 required Caltrans to include an express statement on this topic when soliciting bids for the revised project, we reject its argument. Nothing in section 5105 imposes such a requirement.

Next, St. Francis contends the trial court's review was flawed for several reasons. It first claims the trial court "refus[ed] to consider St. Francis's solid, credible evidence as to the nature or degree of the 'changes.' " (Italics omitted.) But because it offers no record citation to back up this claim, we disregard this argument. (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1406 [courts "may disregard any claims when no reference [to the record] is furnished"].) It also asserts the trial court conflated substantive evidence with substantial evidence. But the court did no such thing. While the court discussed changes it believed were substantive, it never purported to apply, as St. Francis claims, a substantive evidence test. In any event, underlying St. Francis's claim are several misperceptions. While St. Francis maintains that we must review Caltrans's decision under the substantial evidence standard, that is not the applicable standard here, as we have already covered. And while St. Francis focuses here on the trial court's reasoning, we are not concerned with this reasoning. We are concerned instead with Caltrans's decision. And as discussed, St. Francis has not shown that its decision was flawed under the applicable standard of review.

DISPOSITION

The judgment is affirmed.  Caltrans and Alfaro are entitled to recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


        /s/
BOULWARE EURIE, J.


We concur:


        /s/
EARL, P. J.


        /s/
KRAUSE, J.